HENRY B. HEDGEPETH AND OTHERS V. FELIX W. ROBERTSON.

Where the highway is impassable, or it is necessary in order to extricate a
   wagon and team from a bog in the highway, it is lawful to lay down a fence
   by the side of the highway, and pass through the field ; this may be done by
   a slave, in his master's service, the master being responsible for the proper
   exercise of the right.
There can be nothing clearer or better settled, than that it is proper for the
   Court to charge the jury directly upon the legal effect of the admitted or
   uncontroverted facts of the case.
Where a slave is lost to his master by the wrongful act of another, it matters
   not whether he came to his death in one way or another, or whether he is
   dead or alivé, the master is entitled to recover his value.
Where the defendants had proved that the plaintiff, before bringing the suit,
   had expressed an opinion, formed from circumstances then within his knowl-
   edge, as to the existence of a fact, afterwards in issue in the suit, it was held
   that it would not have been proper for the Court to charge the jury, " that the
   admissions of the plaintiff should be received by them as good evidence for
   the defendants."
In cases of wrongful trespass, resulting in the loss of the plaintiff's slave and
   other damage, the jury may allow exemplary damages.

Appeal from Austin.   Tried below before the Hon. James
H. Bell.

Suit by Felix W. Robertson against H. B. Hedgepeth, Jared
E. Kirby and Joseph H. White, to recover damages, com-
menced March 2nd, 1853.   Pleas of not guilty.

Evidence of plaintiff, depositions of A. W. and R. L. Hood,
as follows :

The plaintiff's slave, named John, on or about the 17th of
April, 1853, was driving the plaintiff's team of five yoke of
oxen and wagon, laden with six bales of cotton, the property
of the plaintiff, on the road from Washington to Houston.   It
was immediately after an overflow of the Brazos river ; and

during the night, in the Brazos bottom, on the east side, John got into a bog with his wagon and team, on the public road, where it ran by the side of, and parallel with the fencing of the defendant Kirby ; and John, finding it impossible otherwise to extricate his team and wagon from the bog, there being a large pile of logs on the opposite side of the road, pulled down a portion of the fence, stating that he did not believe Kirby would care. After failing to get his wagon out, John said he would put up the fencing again ; but by this time it was too dark to put up the fence well, and John encamped there. Early next morning, defendant Hedgepeth, Kirby's overseer, coming along, and seeing the fencing pulled down, made a great fuss about it, and attempted to chastise John. Witness told Hedgepeth that the pulling down of the fence was done innocently ; that it should be put up, and that it was a small thing to make a fuss about. In the meantime John ran off a little piece, and stopped for a few moments. As he ran off, Hedgepeth said, You may go, God d—n you ; but I will kill you or whip you before you get home. Hedgepeth then jumped off his horse, put a negro boy on him, and commanded him to go immediately after his double barrel gun and dogs. The negro boy obeyed, and returned in about fifteen minutes with the other two defendants, Kirby and White. Kirby as he rode up, asked Hedgepeth what was the the difficulty. Hedgepeth informed him what had taken place. Kirby then asked who the boy John belonged to. Hedgepeth then asked Kirby what he should do. Kirby told him to pursue the boy John, handing him, Hedgepeth, his gun, and telling him to stop the boy, and not to let him go home. Hedgepeth and White, with the gun and dogs, immediately followed after John, who had fled back towards the river ; after which witness, A. W. Hood, soon heard guns firing and dogs running in the direction they went. In an hour afterwards Hedgepeth returned and said he had seen nothing of John. John was never heard of afterwards. He was an expert swimmer. Wit-

ness turned the team loose in the range ; the cotton was left, three bales on the wagon, and three thrown off in the bog by the wagon. John was an unusually valuable boy ; between twenty-five and thirty years of age ; worth from twelve to thirteen hundred dollars; services worth $180 per year. A witness for plaintiff testified that the damage done to the cotton, the team and the wagon, and the trouble and expense of collecting the team, would amount to about one ' hundred and fifty dollars.

The fence of Kirby's field was being repaired, and was still unfenced a few hundred yards on the road in the direction of Houston, beyond where John took down the fence. At the place where John pulled down the fence, the road that had been travelled a few days before was on the inside of the new fence, and there was no cotton growing on it. John fastened his oxen by a log chain to a stump on the side of the road next the fence, so that few, if any of the oxen could, in swinging around,·reach across the road, (where it had been a few days before) to where the cotton was growing. The cotton was just coming up ; but a few stalks were touched or injured by the cattle.

The defendants' evidence was as follows : The defendants had not cross-examined the plaintiff's witnesses, and the depositions of the same witnesses, taken by the defendants, were as follows :

Witness, (A. W. Hood,) Robert L. Hood, and the negro in question, crossed the Brazos river at Baldridge's Ferry about the 15th or 20th of April, A. D., 1852. The negro boy started from the river, after we had crossed, ahead, and shortly afterwards I started and found him about one-third of the way out of the bottom, with his, wagon upset. After aiding him to reload, it being then nearly dark, we started on again, the negro ahead as before, and when we were about half way up . Kirby's fence, outside of the field, I overtook him again, bogged down ; about the time I stopped my wagon the negro com-

menced pulling down the fence; I told him not to pull down the fence, for we could not get out of the bottom that night; and that we had better tie up our oxen until morning, when I thought we could easily get along outside the fence, but he replied that he be d——d if he did'nt know Col. Kirby, and Kirby knew him, and that he would pull down the fence and go out of the bottom that night; after pulling down the fence he made several attempts to make his oxen pull the wagon into the field, but, failing to do so, he finally concluded to camp. I tied up my oxen on the outside of the fence and built my fire on the opposite side of the road from the fence; the negro, however, carried his oxen on the inside of the fence and, leaving them all chained together, fastened them to a stump in the field, and then built his fire on the inside of the field, about twenty yards from where I was camped, and remained in the field with his oxen, about five yoke, and his horse, until morning. As soon as it became light I saw Kirby's hands at work, up ahead of us, some quarter of a mile, and I told the boy he had better go up where they were and get help, as I myself was unable to assist him, and also told him, if the overseer was there, he had better tell him what he had done. He went off and was gone but a short time when he returned with two stout negro men. As soon as he returned I told him to throw off some of the cotton, and I think they had about three bags off the wagon, when Hedgepeth, one of the defendants, rode up to me and asked me by what authority I pulled down his fence. I replied that I had not done so. He then turned his horse and asked the boy John if he had pulled down the fence, who replied that he had. Hedgepeth asked me then if John was under my charge. I told him that he was not, only so far as to see that the wagon and team were taken care of. Hedgepeth then said to John, "I'll whip you, God d——n you." Upon this Hedgepeth started to ride up to John, but he went round on the opposite side of the oxen. Hedgpeth then said to the boy, " pull of your coat, I mean what I say, sir," to which John

replied, " I spects you does sir." Upon this Hedgepeth spurred
his horse around on the same side of the oxen with John, but
John ran out of the field by the wagon; as he passed the two ne-
groes, who were aiding him to unload, Hedgepeth called to them
to catch him, and one of them made a pass at him, but John told
him not to lay his hands on him ; John then ran about thirty
yards down the road towards the ferry and stopped. As he
was going off, however, Hedgepeth called out to him, " you
can run, God d—n you, but I'll whip you or kill you before
you get home, you d—d son of a b—h." With that Hedge-
peth leaped from his horse, and told one of the negroes above
referred to, to go to Col. Kirby's after his gun and dog ; but
at that time he did not follow John out of the field. I then
observed to Mr. Hedgpeth that may-be we had better fix the
matter up without any difficulty ; but he did not reply ; upon
which I turned and went to John, who was still standing in
the road, about thirty yards off, and when I got up to him,
asked him if he intended to leave ; he said that he did, and I
then told him that he had better come back, for Col. Kirby
would come down, and if they whipped him at all, they should
not whip him much ; but he refused to do so, and hallowed to
my nephew to bring him his horse, but Hedgepeth took hold
of the horse about the same time with my nephew and said that
he would take care of the horse ; about this time John ran off
towards the river. About an half hour after this Col. Kirby
and White, and another young man whom I did not know
came down where we were. Kirby, when he rode up, asked
what the difficulty was ; but I heard no one reply. Kirby
then asked me whose wagon it was, (referring to John's wagon.)
I replied that it was Capt. Felix Robertson's of Independence;
Kirby then said that Robertson was an old friend of his, and
that he disliked to see his wagon left in that fix. Hedgepeth
then said that he would overtake the boy and bring him back,
but after getting about twenty yards off he turned around and
said, " Col. Kirby if you will give me your gun I'll make the d—d

rascal come back ;" Kirby handed him his gun and he went off to-
wards the ferry.    Hedgepeth was absent about a half an hour
and returned without John ; and as he rode up I asked him if
he had seen the boy, he replied that he had not, but that John
had been to the ferry, and the ferryman refused to put him
across the river, and that he did not know what had become of
him.    After this Kirby assisted me out of the bottom with my
wagon, and intended also to aid me in getting Robertson's out,
but I was taken sick after I got mine out, and could not assist
him.    The field was a cotton field, and the cotton was just
getting up to be a good stand.    The oxen were tied to a
stump in the field and trampled down the cotton around the
stump the full length of the team ; they also trampled down
cotton in coming into the field, and during the next morning
they were turned loose and tramped down considerable cot-
ton.    The defendants Kirby and White did not see or speak
to the boy, Hedgepeth being the only one of them present.    I
can recollect nothing more in relation to the matter, except
that, while Hedgepeth was gone, as before stated, I heard a
gun fire in the direction of the ferry, but don't know who
fired it.

    Witness R. L. Hood, testified to same, except that he did
not recollect hearing a gun fire.

    Deposition of William J. White, as follows : I do not recol-
lect the month, but I recollect that in the Spring of 1852, I
was in Col. Jared E. Kirby's yard with him, when one of Col.
Kirby's negroes rode up, riding the overseer's (Mr. Hedge-
peth's) horse, and stated that Mr. Hedgepeth was down in the
bottom in a difficulty with some wagoners, and that he want-
ed Col. Kirby's gun.    Col. Kirby mounted his horse and went
down himself ; Joseph H. White went also, and as there was
no other horse ready, I went upon the horse which the negro rode.
When we got down there we found Mr. Hedgepeth, who stated
that a negro boy with a wagon and team had camped there

the previous evening, and turned his oxen into the field upon the young cotton, after taking down the fence ; that the boy had camped in the field. I examined the field in company with Col. Kirby, Mr. Hedgpeth, Mr. J. H. White and Mr. Hood, (who was in company with the negro boy with another wagon and team,) being all the parties present, and found the fence down, some of the oxen belonging to the negro boy's team in the field. Mr. Hedgepeth stated that he had threatened to whip the boy, when the boy run off. The first question Col. Kirby asked Mr. Hedgepeth was, whom the boy belonged to, to which Mr. Hedgepeth replied that he belonged to Capt. Robertson. " Is it Capt. Felix Robertson, of Independence ?" asked Col. Kirby ; to which Mr. Hood replied yes ; when Col, Kirby remarked that Capt. Robertson was a friend of his, and he hated to see his wagon in such a fix, the wagon being bogged down and part of the load thrown off. Then Mr. Hedgepeth remarked that he could go and overtake the boy and bring him back before he got to the river, and Col. Kirby said he would be very glad if he would do so. Mr. Hedgepeth started to go, but turned round to Col. Kirby and said, " hand me your gun, for, if he sees me, he will be sure to run from me." Col. Kirby handed Mr. Hedgepeth the gun, which was loaded ; then Joseph H. White asked Col. Kirby to allow him to go, and Col. Kirby said he might do so. Then I asked Col. Kirby if I might go, and he told me I could not as I had no horse to ride, (having rode Mr. Hedgepeth's horse down to the bottom, behind the negro.) Mr. Hedgepeth and Joseph H. White then rode off together. They were gone probably half an hour, when they returned ; when they came back they stated they had not seen the negro ; that the ferryman at Rock Island ferry told them the boy had been there a few minutes before. We all then returned to Col. Kirby's house together, and I found the gun still loaded, and believe that the gun had not been fired off during their ab-

sence, and neither of them, to my knowledge or belief, had any powder or lead with them, to reload, in case of necessity. What I have here stated occurred in Austin county.

The defendant then introduced Thomas J. Wells, who testified that he heard the plaintiff, Robertson, say, about one or two days after the occurrence, in a conversation with Mr. Howth, that he, Robertson, had trailed the negro John from where said negro left the road at the ferry, down the river for half a mile, or more, and that there were no signs of any persons pursuing said slave from the road, and that he did not believe that any one had shot the negro.

The Judge instructed the jury, without request, as follows :

That, if they believe from the evidence that the boy John pulled down the fence of defendant Kirby, only for the purpose of extricating his wagon and team from the bog, and that no real damage was done to Kirby by the act, it was a trespass without injury, for which, at most, nominal damages could have been recovered, and for which neither Kirby nor his overseer had a right to inflict personal chastisement upon the slave. If, on the other hand, the jury believe from the evidence, that there was no necessity for pulling down the fence, or that any unavoidable injury was done to Kirby's property, in that case the defendant Kirby, or his overseer, would have the right to inflict moderate and reasonable personal chastisement upon the slave.

If the jury believe from the evidence, that Kirby consented to the pursuit of the slave John by White and Hedgepeth, or encouraged such pursuit to be made by White and Hedgepeth, with force and arms, such consent made Kirby a co-trespasser with White and Hedgepeth.

Under the circumstances of this case the pursuit of the slave John, with dogs and arms, was a wrongful act and a trespass in contemplation of law, and the owner of the slave is entitled to recover from the defendants such losses as are the natural results of the wrongful acts of defendants.

Vol. XVIII.          55

The mere absence of the slave, without having been heard from since the Spring of 1852, is not sufficient, of itself, to raise a presumption of his death, but it is competent for the jury to infer his death from the circumstances of the pursuit.

The jury cannot give damages for the value of the negro and for his hire too down to this time; but any loss of property which resulted naturally and directly from the wrongful acts of defendants, and any expenses incurred in the protection of the cotton or team, necessarily incurred by plaintiff in consequence of the wrongful act of defendants, are proper to be considered in your estimate of the damages. The jury must judge of the evidence for themselves.

The defendants excepted to the instructions so given, and requested the Court to give the following instructions, which were refused :

1st. If a person in repelling the trespass of a slave, should frighten the slave, so that the slave should run off and be lost to his master, the person, so repelling the trespass, will not be liable to the owner of the slave for the hire or value of the slave.

2d. A person cannot recover damages, unless he proves that he has sustained damages, and unless he proves the amount of the damages which he has sustained.

3d. The plaintiff cannot recover the value of the negro John, unless he has proved that the negro came to his death by the wrongful act of the defendants, or some one or more of them.

4th. The jury cannot presume the death of the negro from the mere proof of his not having been heard from since April, A. D., 1852.

5th. The plaintiff cannot recover the value of the oxen and wagon and cotton, unless he has proved the total loss of said property to him by the wrongful act of some one or more of the defendants.

6th. The plaintiff cannot recover the damages sustained to

the cotton, wagon and team unless they have proved the amount of damages so sustained.

7th. The employee is not responsible for a trespass committed by his overseer, unless the same is done by his command and consent.

8th. If you believe that the defendants are not in fault, that they have not committed the trespass complained of, you will find for the defendants.

9th. The declarations of the defendant, Hedgepeth, as introduced by plaintiff, are good evidence both for and against the defendants.

10th. The admissions of the plaintiff, Robertson, should be received by the jury as evidence for the defendants.

Verdict and judgment for the plaintiff for $1300. Motion for new trial overruled, &c.

*Ballinger & Jack,* for appellant Kirby. I. The ground of complaint of the defendant Kirby is that he was not allowed the right of trial by jury in this case in the sense in which that right is guaranteed to every citizen of the State.

The charge of the Judge was " under the circumstances of " this case, the pursuit of the slave John with arms and dogs " was a wrongful act, and a trespass in contemplation of law ; " and the owner is entitled to recover from the defendants such " losses as are the natural result of the wrongful acts of de- " fendants."

This determines the whole case. It settles the character and circumstances of the pursuit, and pronounces that pursuit the trespass, for which all the defendants were to be held liable for the value of the slave. The jury were allowed no liberty but to assess damages.

The facts of this case will not tolerate a peremptory charge, in effect, to the jury that Col. Kirby should be held responsible for the value of the slave.

1st. It is clear that the negro committed a trespass in pull-ing down the fence, and turning his oxen in all night on the young cotton.

2d.  The owner had a right properly to chastise him there-for.  There was no civil remedy against his master. (McMa-nus v. Crickett, 1 East. 106 ; Lyons v. Martin, 8 Ad. & El. 512 ; Timothy  v. Simpson, 6 C. &  P. 499 ; Snee v. Trice, 2 Bay's R. 343.)  Even if there was a  civil remedy against the master, there are " other salutary checks," in the language of the case in 2 Bay, which are more efficacious—that is, the pro-per punishment of the slave.  It would be perfectly absurd to say, that slaves could be sent from  the interior  parts of the State to Houston, to camp out along the road, and that for such trespasses as  they are  liable  to  commit, there  should be no preventive or correction, but a suit against the master, or tak-ing the slave before s civil magistrate.

3d. The overseer  attempted  to  punish the slave, and the latter ran off towards the ferry.  If the overseer had a  right to punish him, so far, no wrong was done.  If he had  not, it was  a  wrong in which Kirby did  not  participate, of which he was ignorant, and for which  he  is  not responsible.  The negro was never afterwards seen.  Robertson proves the state-ments of Hedgepeth and White that they had not seen the ne-gro.  Robertson himself said he  had tracked the negro down the river, and was satisfied he had not been  overtaken.  Now what caused the loss of the negro ?  Was it his running away to avoid the whipping ?  Did he attempt, as he said he would, when he left, to go home to his  master ?  Did he try to swim the river and was drowned ?  Did he  run away, and has  not since been heard from ?  Or, when subsequently pursued, was he overtaken and murdered, or devoured by the  dogs, or run into the river and drowned ?

Who shall decide that question ?  Is it undisputed and clear from the record ?  We affirm, without hesitation, that no man can read the record and say candidly that the latter hypothesis is

undisputed. Nor do we believe it at all probable. If the loss of the negro resulted from his leaving to avoid the whipping, there can be no pretense of liability on the part of Kirby, and that question should have been left to the jury.

4th. Kirby came up, expressed his regret at what had occurred, spoke of Robertson as his friend, and put his own negroes to work to rescue Robertson's cotton and team from their condition.

The overseer proposed to bring back the negro, and asked for Kirby's gun, and Kirby's brother-in-law went along. Riding off they were followed by the dogs which were around. Said his Honor below, this pursuit was a trespass. Did not that depend on its design, or at least on its results.

The object clearly was to bring back the negro—the gun was taken, not to shoot him down ; but to control him, and make him stop. But it is useless to discuss the design. The negro must have been overtaken and injured, or his injury must have resulted from the pursuit, in order that the pursuit should have been a trespass. He may have been pursued with the spirit of fiends and with the force of an army : but unless they found him, and thereby forced the negro to do something to his injury, it was no trespass. What caused the loss of the negro was the practical necessary question for a jury to decide. To assume that this is clear and undisputed from the record and that there was any blameable connection therewith on the part of Col. Kirby is, we think, to do extreme violence to the testimony, and cause great injustice. It has been settled against him, not by the verdict of the jury, but by the fiat of the Judge.

*F. Lipscomb* and *J. B. & G. A. Jones*, for appellee.

WHEELER, J. The pulling down of the fence, under the circumstances, was a necessary and justifiable act, and no tres-

pass. (2 Kent, Com. 338.) But if it did amount to a trespass, it was not an unauthorized and wanton, wilful or malicious trespass; it was done by the slave necessarily, in the performance of his master's service, in the pursuance and execution of the authority and duty confided to his slave; and if there was any injury occasioned by the act, the master was responsible for it. (McManus v. Crickett, 1 East. R. 106; Story Agency, Sec. 456, n; Id. 318.) Night had overtaken the slave; he was unable to proceed on his way, or to see to put up the fence properly, and he had a right to camp upon the spot. If there really was any injury done to the cotton, it must have been very trifling; a small matter, as the witnesses thought, to make a fuss about; certainly a very small matter to make the occasion of a desperate resolve to whip or kill the slave of a neighbor, who had not delegated to them his power and authority over his slave, and who was himself responsible, and would doubtless readily have made reparation, if any injury had been done. It is very evident that no injury had been intended. The field was not inclosed; a little further on there was no fence; it is not probable, in the night as it was, and in the situation he was in, that the negro saw or knew there was cotton planted there; there is no reason to believe he intended anything wrong, or supposed he had done anything for which he would incur the displeasure of the defendants. The contrary is evident.

There was no complaint of any injury to the cotton at the time; that appears to have been an after discovery. It was the pulling down of the fence, which appears to have given the offence; and in that the negro had done nothing to incur blame, much less to give occasion for that hot haste and desperate resolve, which would listen to no explanation, apology or intercession, nor stop at anything short of unlimited chastisement, or the death of the slave.

Comment upon the evidence is unnecessary. It is indisputable that the defendants' interference with the negro, in the

manner of it and under the circumstances, was, to say the least of it, unauthorized and improper. They had no right to drive or frighten the slave away from his master's employment and the care of the property entrusted to him, by threats and violence; nor had they any right to go after and bring him back by force. The master had not delegated to them any such authority over his slave. If he left his master's employment without cause, that was the master's concern, not theirs. Their interference with the negro, under the circumstances and in the manner of it, was not a trespass merely, but an outrage upon a neighbor's property and rights, for which all concerned are alike responsible, civilly, for the injury thereby occasioned.

The charge of the Court is not obnoxious to the objection that it is a charge upon the weight of evidence; nor, when rightly viewed in its connexion and according to its obvious sense and meaning, is it obnoxious to just criticism; much less to the grave imputation that its effect was to deny the defendants their constitutional right of trial by jury.

There was no question to leave to the jury as to the sufficiency of the evidence to prove the fact and manner of the pursuit. These were not contested upon the trial; but were proved, as well by the defendants' evidence as the plaintiff's. There was no question of evidence for the jury to weigh on that subject. There was and could be no question about the fact of the pursuit and the manner of it. It was entirely proper, therefore, for the Court to proceed directly to instruct the jury as to the legal effect of such a pursuit, without submitting a hypothetical case, as though there was a question about the fact, when there was none. Such a course would, or might have had a tendency to mislead, by inducing the jury to suppose they were at liberty to find contrary to the plain and uncontroverted truth of the case, that there had not been such a pursuit.

There can be nothing clearer, or better settled, than that it

is proper for the Court to charge the jury directly upon the legal effect of the admitted, or uncontroverted facts of the case; as the Court did in this instance. It manifestly was not a charge upon the weight of evidence; but upon the legal effect of facts, proved indisputably by the evidence on both sides, and not open to question or dispute. By the expression, "the circumstances of this case," the Judge evidently meant nothing more than simply to distinguish, in a word, between the present and a case where he supposed it might be lawful to pursue a negro with dogs and arms; as where he had committed a felony, or was a fugitive and runaway from the service of his master, and could not be otherwise apprehended. The obvious intention and effect of the language of the charge was, to instruct the jury that this was not that character of case. There could be no pretence that it was. Nor can there be a question that it was right and proper for the Court to instruct the jury as to the legal effect of the pursuit under the circumstances of this case, as they were proved and admitted by the evidence on both sides.

The error assigned in the refusal of instructions scarcely requires notice. The refusal of the tenth instruction asked is complained of. The question for the jury to decide was, whether the slave had been lost to the plaintiff by the wrongful acts of the defendants; and upon that issue, the statement of the plaintiff, relied on as an admission, really amounted to no evidence in favor of the defendants. What the plaintiff may have said about tracking the negro, and what he then thought about his having been shot, did not tend, in the remotest degree, either to prove or disprove the issue. It was not material whether the negro came to his death in one way or the other, or whether he was dead or alive, so that, by the wrongful acts of the defendants, he had been lost to the plaintiff. (Robinson v. Varnell, 16 Tex. R.) But if the statement of the plaintiff had been evidence, it had gone to the jury, as such, without objection; and to have given the instruction

asked would have had a manifest tendency to give it undue importance in the minds of the jury. In any view of it the instruction was very properly refused.

There manifestly was no error committed upon the trial, to the prejudice of the defendants. But there was error in the charge of the Court to the evident prejudice and injury of the plaintiff. The Court limited the jury in their award of damages to the rule of mere compensation. This was error. It was a clear case for the awarding of exemplary damages; and the jury ought to have been instructed that they were at liberty to give such damages. It was an unwarrantable interference, on the part of the defendants, with the plaintiff's property, attended by circumstances of aggravation, which called for the imposition of damages, not for compensation merely, but also for punishment and prevention. There are scarcely any damages which an unprejudiced jury would give in such a case, which the law would deem excessive. But this was an error in favor of the appellants, one which doubtless operated in their favor; it was an error committed against the plaintiff; but of which he has not complained, and the defendants can not. There was not the slightest ground for prosecuting this appeal by the defendants; and we are of opinion that the judgment be affirmed with damages.

Affirmed with damages.