### GOWIN v. GOWIN. (No. 10540.)*

(Court of Civil Appeals of Texas. Fort Worth. May 17, 1924. Rehearing Denied June 14, 1924.)

**1. Husband and wife ⬅205(2) — Wife may maintain court action against husband if damages belong to her separate estate.**

If damages from husband's wrongful acts toward wife belong to her separate estate, then she has legal right to maintain her suit therefor against her husband, in view of Rev. St. art. 4621, as amended by Laws 1913, c. 32 (Vernon's Sayles' Ann. Civ. St. 1914, art. 4621).

**2. Constitutional law ⬅153, 328 — Husband and wife ⬅205(2)—Wife has no cause of action against husband for damages by reason of breach of marriage contract resting solely upon rights and obligations which law attaches to marriage status.**

Neither under the statutes nor under the common law has a wife a cause of action for damages against husband for cruel treatment and failure to provide support promised prior to marriage, and for humiliation and mortification; her only relief being such as is given by statutes on divorce, in view of Vernon's Sayles' Ann. Civ. St. 1914, Vernon's Ann. Civ. St. Supp. 1918, arts. 4621–4624, 5492, notwithstanding Const. art. 1, §§ 13, 16, requiring courts to be open, and providing remedy for injury done, and providing no law impairing obligation of contract shall be made, and Const. U. S. Amend. 14, § 1.

Conner, C. J., dissenting.

Appeal from District Court, Clay County; H. R. Wilson, Judge.

Action by Emma Lee Gowin against Jesse C. Gowin. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Taylor & Taylor and J. L. Lackey, all of Wichita Falls, and H. M. Muse, of Henrietta, for appellant.

Ocie Speer, of Fort Worth, and Wantland, Dickey & Glasgow, of Henrietta, for appellee.

DUNKLIN, J. Jesse C. Gowin has appealed from a judgment recovered against him by his wife, Emma Lee Gowin, for damages alleged to have been sustained by the wife by reason of the breach of the marriage contract by the husband. According to allegations in plaintiff's petition, she was married to the defendant November 8, 1920. Soon after the marriage, the defendant began a course of outrageously cruel treatment of her, and on many occasions thereafter violently assaulted, kicked, and scratched and threatened her with bodily injury, all in anger and without any provocation on her part. Such treatment on the part of the defendant continued without abatement and grew worse all the time until the month of February, 1921, when plaintiff was forced to leave him to save herself from bodily harm. Since such separation the plaintiff has lived separate and apart from the defendant. After the separation, plaintiff endeavored to induce the defendant to take her back, accord to her the treatment to which she was entitled from a husband and to forego his cruelties, all of which the defendant refused to do.

Plaintiff alleged that the treatment so received by her from the defendant was so outrageous and cruel as to render their further living together insupportable, and therefore the separation is permanent, although she desired no divorce.

She alleged that prior to the marriage she was a widow, engaged in the millinery business, which was her only means of earning a support, and defendant was a widower who represented himself as a wealthy man and able to supply her every want and provide her with a fine home and support her in the best possible manner if plaintiff would marry him. By reason of the defendant's promises of such support, in addition to his further promise to treat her kindly, all of which promises and assurances were often repeated, plaintiff was finally induced to marry the defendant.

According to further allegations, plaintiff has sustained damages by reason of the breach of defendant's marriage contract, which she sought to recover. The damages so alleged consist in the loss of the benefits, comforts, emoluments, and advantages that she was entitled to receive and would have received but for the defendant's breach of his marriage contract. She also claimed damages for the humiliation and mortifica-

tion which she has suffered, and also for physical suffering which she has sustained in consequence of the nervous wreck in which she has been left by reason of the defendant's wrongful treatment, as above stated.

In the answer filed by defendant, all of the allegations in plaintiff's pleadings were denied.

The trial was before a jury on special issues, in answer to which the jury found:

(1) That the defendant had been guilty of excesses, cruel and outrageous treatment toward the plaintiff of such a nature as to render their living together insupportable.

(2) That by reason of such treatment plaintiff had ceased to live with the defendant.

(3) That plaintiff has sustained pecuniary losses in the sum of $1,000 by reason of defendant's breach of his marriage contract, and has sustained mental suffering by reason of such breach, the reasonable compensation for which is $500.

(4) That, prior to the agreement of the parties to marry, defendant did not represent to plaintiff that he was a wealthy man, but did represent to her that he would provide her with one of the nicest homes in Clay county, as alleged in plaintiff's petition; and that he would provide or arrange conditions suitable to plaintiff's enjoyment of life; but that none of such representations materially induced the plaintiff to enter into the agreement to marry the defendant.

The jury further found that the defendant did not perform any of said promises.

There was evidence sufficient to support the findings of fact made by the jury, and, although the defendant introduced testimony to the contrary, no assignment has been presented complaining that the evidence was insufficient to sustain the verdict.

The record shows that plaintiff was 48 years old at the time of the trial; that her former husband had been dead more than 6 years when she married the defendant, and that from his estate she received about $2,300 in money and a small four-room cottage in the town of Seymour. When she married the defendant, she was engaged in the millinery business for a livelihood and owned about $1,000 in money. The defendant testified that he did not know his exact age, but from what he had been told by his mother he estimated it to be approximately 70 years. His former wife had been dead for a number of years, and to that marriage ten children were born, all of whom are still living, and most of whom are now married. His property consists of several hundred acres of land which is used by him for farming and stock raising purposes, about 500 acres being in cultivation. His stock consists of about 60 head of cattle and about 25 head of horses. According to his testimony, which it seems was not contradicted, his habits of living have always been plain and frugal, and he lives on his farm and earns his living from its use. The evidence indicates that the house in which he lives is a plain old country home, reasonably comfortable, but not ostentatious.

If plaintiff's petition states a cause of action for damages for the wrongs alleged and found by the jury, then we believe that such cause of action and the right to recover thereon was a property right belonging to her separate estate. To hold that the same would belong to the community estate would be to allow the defendant to profit by his own wrong; in other words, it would give him the right to share equally with his wife in the damages which he has wrongfully caused her and also to control and manage her part as well as his own, under and by virtue of the statute giving the husband such control over the community estate.

[1] In Nickerson v. Nickerson, 65 Tex. 281, damages recovered by Mrs. Nickerson against Matson for a tort committed by him and plaintiff's husband jointly was held to be the separate property of the wife, although not coming within the contemplation of our statutes declaring what shall be separate and what shall be community property. That conclusion was reached by reason of the fact that, since the husband was a joint tortfeasor with Matson, he could not, either alone or by being joined with his wife, enforce a recovery against Matson for the tort; and since he had no such right he could not have any interest in the cause of action; and that, since the wife had the right of recovery in which the husband could not have any interest, necessarily, that right of action would be her own separate property. For the same reason the cause of action asserted by plaintiff in the present suit, if any she has, is her separate property. And if such damages belong to her separate estate, then she has the legal right to maintain her suit therefor against her husband, as is well settled by numerous decisions in this state, some of which are the following: Price v. Cole, 35 Tex. 461; Ryan v. Ryan, 61 Tex. 473; Dority v. Dority, 96 Tex. 215, 71 S. W. 953, 60 L. R. A. 941; Holland v. Riggs, 53 Tex. Civ. App. 367, 116 S. W. 167; Shaw v. Shaw, 50 Tex. Civ. App. 363, 111 S. W. 223; Heintz v. Heintz, 56 Tex. Civ. App. 403, 120 S. W. 941. Those decisions have been supplemented by the amendment of article 4621 of our statutes, passed in 1913 (Laws 1913, c. 32; Vernon's Sayles' Ann. Civ. St. 1914, art. 4621) giving the wife, during her marriage, the sole management, control, and disposition of her separate property, since the authority so given implies the further incidental power to institute and maintain any suit to protect or enforce such property rights. Whitney Hardware Co. v. McMahan, 111 Tex. 242, 231 S. W. 694.

The next question to be determined is: Does the plaintiff's petition, considered in connection with the findings of the jury,

show a right of recovery against the defendant, from whom she has never been divorced?

Following are the principal propositions urged in appellee's brief in support of the recovery decreed to her:

"To deny plaintiff a remedy for the injuries complained of is to violate the bill of rights of this state, article 1, § 13, declaring: 'All courts shall be open; and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law;' and moreover, is to deny to her that due process of law, the equal protection of the laws vouchsafed by the Constitution of the United States contained in Amendment 14, § 1.

"The principles of the common law are not controlling as to plaintiff's right to maintain this suit, since the common law regulating marital rights has never been in force in Texas, but such rights have from the beginning been defined and regulated by statutes, and the disabilities of coverture are therefore determined by such statutes.

"The contract for marriage confers valuable property rights upon the parties even before its partial performance by marriage, and the law affords redress to the injured party against the person breaching, or wrongfully causing the breach of, such contract, whether before or after marriage.

"The property rights of a wife in her marriage contract having their inception in a contract executed before marriage, constitutes a part of her separate estate, being property 'owned or claimed by her before marriage.' "

The following provision is taken from the Constitution of the Republic of Texas, adopted in 1836:

"The Congress shall, as early as practicable, introduce by statute the common law of England, with such modifications as all circumstances in their judgment may require; and in all criminal cases the common law shall be the rule of decision."

See section 68, Speer's Marital Rights.

In compliance with that provision of the Constitution, the Congress of the Republic passed an act, January 20, 1840, reading, in part, as follows:

Section 1: "Be it enacted by the Senate and House of Representatives of the Republic of Texas, in Congress assembled, that the common law of England (so far as it is 'not inconsistent with the Constitution or the acts of Congress now in force) shall, together with such acts be the rule of decision in this Republic, and shall continue in full force until altered or repealed by Congress."

Section 2: "Be it further enacted, that all laws in force in this Republic, prior to the first of September, one thousand eight hundred and thirty-six (except the Laws of the Consultation and Provisional Government, now in force, and except such laws as relate exclusively to grants and the colonization of lands in the state of Coahuila and Texas, and also such laws as relate to the reservation of islands and lands, and also of salt lakes, licks and salt springs, mines, and minerals of every description; made by the general and state govern-

ments) be, and the same are hereby repealed." Gammel's Laws of Texas, vol. 2, pp. 177, 178.

Other sections of the same act define the marital rights of property of the two spouses, which are quite similar to our present statutes on that subject.

By that act the entire body of the civil law theretofore in force was expressly abrogated, and the common law was adopted in its place and stead as a rule of decision, with the exception that by section 13, in order to avoid giving the act a retroactive effect, it was provided, in substance, that marital rights theretofore acquired under the civil law would still be governed by that law.

In Courand v. Vollmer, 31 Tex. 397, the Supreme Court, after quoting that constitutional provision and act of Congress, used this language:

"It is perfectly apparent that the whole system of the common law of England was not adopted by this act, but simply that portion of it which related to 'the rule of decision.' The substratum of the law of the parent country was the civil law. This, together with the statutes in force in Mexico and in Coahuila and Texas on the 2d of March, 1836, were the laws in force when Texas became a separate government, and remained such until repealed. The Constitution of 1836 and the acts of three different Congresses had already furnished a collection of laws sufficient for a superstructure, but the basis or foundation of the judicial system was the civil law, and it was this which formed the rule of decision up to January, 1840.

"This act, therefore, substituted the common law of England in place of the civil law as 'the rule of decision,' and for this only. It did not adopt the common law of England as a rule of practice, or to be used except when something was to be decided. This, of course, contemplated judicial decisions, and was intended for the direction of the judiciary to resort to the unwritten law of England in those cases where the statutes are silent."

Article 5492, Rev. Statutes, reads as follows:

"The common law of England, so far as it is not inconsistent with the Constitution and laws of this state, shall, together with such Constitution and laws, be the rule of decision, and shall continue in force until altered or repealed by the Legislature."

It is evident that that article as now embodied in the statutes is the same as the act of Congress of the Republic, quoted above, with the words relating to the Congress of the Republic eliminated, and words referring to the Legislature of the state substituted therefor. That article has been carried forward in our statutes since the year 1840.

Articles 4621, 4621a, 4622, 4623, 4624 of our statutes (Vernon's Sayles' Ann. Civ. St. 1914) define the property rights of husband and wife, and the respective rights of control and management of the same by each. Article 4621 reads, in part, as follows:

"All property, both real and personal, of the husband, owned or claimed by him before marriage, that acquired afterward by gift, devise or descent, as also the increase of all lands thus acquired, shall be his separate property. All property, both real and personal, of the wife, owned or claimed by her before marriage, and that acquired afterward by gift, devise or descent, as also the increase of all lands thus acquired, shall be the separate property of the wife."

Article 4621a provides:

"All property or moneys received as compensation for personal injuries sustained by the wife shall be her separate property, except such actual and necessary expenses as may have accumulated against the husband for hospital fees, medical bills and all other expenses incident to the collection of said compensation."

In Grigsby v. Reib, 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011, the controlling issue was whether or not the plaintiff, who had assumed the name of Mrs. Jessie Stallcup, was the common-law wife of G. M. D. Grigsby, who later died, leaving as his heir Mrs. Eliza J. Reib. The plaintiff claimed an interest in the estate of, decedent as his surviving wife, and she sued Mrs. Reib, a sister and heir of decedent, to recover a part of the estate. A judgment denying plaintiff the right of recovery, because she did not establish by proper proof the alleged common-law marriage, was affirmed by the Supreme Court in an opinion rendered by Chief Justice Brown. The following is an excerpt from that opinion:

"We must first ascertain what the Congress of the Republic intended to designate by the language, 'The common law of England.' If it was intended to adopt the common law as it was in force in England in 1840, then we have no common law on the subject or marriage, for none such was in force in that kingdom at that date. Our courts have uniformly recognized the existence in this state of the common law which permitted marriage without compliance with the statute upon that subject; therefore, we conclude that 'the common law of England,' adopted by the Congress of the Republic, was that which was declared by the courts of the different states of the United States. This conclusion is supported by the fact that the lawyer members of that Congress, who framed and enacted that statute, had been reared and educated in the United States, and would naturally have in mind the common law with which they were familiar. If we adopt that as our guide and source of authority, the decisions of the courts of those states determine what rule of the common law of England to apply to this case.

"The effect of the act of 1840, supra, was not to introduce and put into effect the body of the common law, but to make effective the provisions of the common law, so far as they are not inconsistent with the conditions and circumstances of our people. Land Co. v. McClelland Bros., 86 Tex. 185, 23 S. W. 576, 1100, 22 L. R. A, 105."

In Barkley v. Dumke, 99 Tex. 150, 87 S. W. 1147, it was held that a putative wife, who had in good faith married a man who had a lawful wife, acquired the interest of a lawful wife in property acquired by the putative husband and wife during the time they lived together as such. In that opinion, Chief Justice Gaines said:

"Perhaps under the strict rules of common law, we should be constrained to rule that the marriage of defendant in error with Wood was absolutely void to all intents and purposes and therefore to hold the conveyance from Wood and the putative wife also void. But we are of the opinion that the common-law rule does not apply to this case. The title of the act of January 20, 1840, entitled 'An act to adopt the common law of England, to repeal certain Mexican laws, and to regulate the marital rights of parties,' indicates that the rights of married persons were to be defined by statute and not to be governed by the rules of the common law. The provisions of the act with reference to married persons are so inconsistent with the rules of the common law as to show an intention to maintain in reference to marital rights a radically different system. The fact that these provisions were incorporated in the act which adopted the common law is of itself significant of the purpose of the Legislature, not to apply the rules of the common law as to the property rights of husband and wife. In this connection it is notable also that the statutory rules which were adopted are taken in the main from the Spanish law which then prevailed in the Republic. So striking is this fact as to justify Chief Justice Hemphill in saying in Burr v. Wilson (18 Tex. 370): 'Our laws on marital rights are in substance but a continuation of the rules of Spanish jurisprudence on the same subject-matter;' and again in Bradshaw v. Mayfield (18 Tex. 29): 'But the common law is not and never has been of force in this state on the subject of marital rights."

But Judge Gaines concluded that opinion with the following:

"We would not be understood as saying that the rules of the common law as to husband and wife apply in no case under our system. They have been frequently applied in divers instances in the decisions of our courts. What we do hold is that the common law as to the consequences of a void marriage does not apply in this case."

The underlying principle supporting the property right of the innocent putative wife was the common-law rule applicable to acquisition of property by partnership firms or joint purchasers, the benefits of which rule may be accorded to such a wife without violating any public policy, if she has entered into the relation innocently and in good faith, as appears from the opinion in that case, read as a whole, and as interpreted in F. W. & D. C. Ry. v. Robertson, 103 Tex. 504, 121 S. W. 202, 131 S. W. 400, Ann. Cas. 1913A, 231.

The term "marital rights," as used in those

decisions, meant rights of property, title to which is acquired before or during the marriage. And the same is true of the provisions of our statutes defining what is community property of the husband and wife, and what is the separate property of each. What would constitute title or right of property, which after its acquisition will be classed as separate or community property, is not fixed by those statutes.

[2] Plaintiff did not sue to recover on any prenuptial contract of defendant to pay her money or to settle property upon her in consideration of her marriage to him. And since his agreement to marry was fully performed, and was submerged in and superseded by the marriage, her alleged right of action necessarily rests upon the rights and obligations which the law attaches to the marriage status. That alleged right of action is not given by our statutes which fix the property rights of husband and wife, since it is based on the marital contract itself, and therefore does not accrue either before or after the marriage, within the language of those statutes, nor is it given by any other statute. And if it be true, as said by Justice Hemphill and as is insisted by appellee here, that "the common law is not and never has been of force in this state on the subject of marital rights," then it must follow that neither under the statutes nor under the common law has plaintiff a cause of action such as is here asserted, but her only relief as against the alleged wrongs of her husband is such as is given by our statutes on the subject of divorce. Trevino v. Trevino, 63 Tex. 650.

By section 13 of article 1 of our state Constitution, it is provided that:

"All courts shall be open; and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."

But that article does not purport to determine what shall constitute title to property or the property right that is there protected from injury. Likewise, by article 1, § 16, of the Constitution, it is provided that:

"No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."

But that article does not prescribe what shall constitute such a contract as is there referred to. Manifestly, it is implied that a contract constituting such a property right must be one which is given that effect, either by statute or by the common law, in order for it to come within the protection of either of those articles. Whether or not a contract is of that character is left to be determined by the statutes, when applicable, or by the rules of common law. For illustration, gambling contracts and contracts of married women which are unenforceable under the common law, and which are not removed from the operation of the common law by statutes, do not come within the protection of either of those constitutional provisions. That is too well settled to require the citation of authorities. Hence it follows that appellee must rely upon the common law or some statutes, rather than upon the Constitution, to show that the cause of action here asserted is maintainable.

As noted in some of the decisions mentioned, it was stated that the provisions of the act of 1840, fixing the respective rights of husband and wife to property acquired during marriage, embodied the Spanish, or civil law, rather than the common law. However, after its passage, its force as law was by reason of the fact that it was then a statute, since by the same act the Spanish, or civil law, theretofore in force in the Republic, was expressly repealed, in general terms. And after its passage the act, to the extent of its scope, took precedence of the common law on the same subject, even though by the act the common law as a general system was adopted. After the repeal of the Spanish law, then, in the absence of a statute, there was no other law to govern, except the common law.

Article 4608, Rev. Statutes, reads:

"All regular licensed or ordained ministers of the gospel, Jewish rabbis, judges of the district and county courts, and all justices of the peace of the several counties are authorized to celebrate the rites of matrimony between all persons legally authorized to marry."

But there is no statute which prescribes the specific obligation which each party must assent to in order to consummate the marriage. In Grigsby v. Reib, supra, it is said:

"It is well settled in this state that a marriage without a license or ceremony may be lawfully entered into when by consent of both parties they professedly as husband and wife cohabit and maintain that relation."

Again the court, after referring to what is termed a "stock phrase," to the effect that marriage is a civil contract, said:

"The fallacy of the phrase so frequently quoted is in the fact that it ignores the correct definition of marriage, that it is a status —the relation of husband and wife. A status cannot be created by contract.

"The attitude of this court on this question is best shown by the excellent opinion written by Judge Lightfoot in Ingersol v. McWillie, 30 S. W. 36, which was approved by this court. Judge Lightfoot, said: 'Each mutually agreeing that they would then and thenceforth be husband and wife, and upon the faith of such mutual agreement and promise they then and thenceforth cohabited and lived together as such husband and wife and so continued.' The opinion was approved by this court on application for writ of error. Ingersol v. McWillie, 87 Tex. 647. * * *

"The term, 'civil contract,' as applied to marriage, means nothing now, for there does

not exist the church's claim that it is a religious rite; there is nothing to be differentiated by the language; it is obsolete. Marriage is not a contract, but a status created by mutual consent of one man and one woman. The method by which it is solemnized, or entered into, may be by proceedings prescribed by statute, or by mutual agreement with cohabitation, * * * producing the status of husband and wife."

To the same effect is 18 R. C. L. p. 383.

It is a familiar rule that the state, as the representative of society, is a third party to the marriage status. 1 Bishop on Marriage, Divorce, and Separation, § 72. And, as illustrative of such interest of the state, the following was said in Grigsby v. Reib, supra:

"The question presented in this case is of first importance; indeed, it lies at the foundation of good society. In Sheffield v. Sheffield, 3 Texas, 86, our first Chief Justice Hemphill said: 'The nature, object and important purposes of the contract should have their just influence upon the mind. The parties have pledged themselves, not only for their own happiness, but for purposes important to society, to live together during the term of their natural lives. This engagement is the most solemn and important of human transactions. It is regarded by all Christian nations as the basis of civilized society, of sound morals, and of the domestic affections; and the relations, duties, obligations and consequences flowing from the contract are so important to the peace and welfare of society as to have placed it under the control of special municipal regulations, independent of the will of the parties. The mutual comfort and happiness of the parties are the principal, but not the only, objects of the engagement. It is intended, also, for the benefit of their common offspring, and is an important element in the moral order, security and tranquillity of civilized society."

"In his work on the conflict of laws, Judge Story said: 'The contract of marriage is the most important of all human transactions. It is the very basis of the whole fabric of civilized society. The status of marriage is juris gentium, and the foundation of it, like that of all other contracts, rests on the consent of the parties. But it differs from other contracts in this, that the righs, obligations, or duties arising from it are not left entirely to be regulated by the agreements of parties, but are, to a certain extent, matters of municipal regulation, over which the parties have no control by any declaration of their will. It confers the status of legitimacy on children born in wedlock, with all the consequential rights, duties, and privileges thence arising; it gives rise to the relations of consanguinity and affinity; in short, it pervades the whole system of civil society.' "

The following was said in Maynard v. Hill, 125 U. S. 211, 8 Sup. Ct. 729, 31 L. Ed. 654:

"It is also to be observed that, whilst marriage is often termed by text-writers and in decisions of courts a civil contract—generally to indicate that it must be founded upon the agreement of the parties, and does not require any religious ceremony for its solemnization—it is something more than a mere contract. The consent of the parties is of course essential to its existence, but when the contract to marry is executed by the marriage, a relation between the parties is created which they cannot change. Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities. It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress. This view is well expressed by the Supreme Court of Maine in Adams v. Palmer, 51 Me. 481, 483. Said that court, speaking by Chief Justice Appleton:

" 'When the contracting parties have entered into the married state, they have not so much entered into a contract as into a new relation, the rights, duties, and obligations of which rest not upon their agreement, but upon the general law of the state, statutory or common, which defines and prescribes those rights, duties, and obligations. They are of law, not of contract. It was a contract that the relation should be established, but, being established, the power of the parties as to its extent or duration is at an end. Their rights under it are determined by the will of the sovereign, as evidenced by law. They can neither be modified nor changed by any agreement of parties. It is a relation for life, and the parties cannot terminate it at any shorter period by virtue of any contract they may make. The reciprocal rights arising from this relation, so long as it continues, are such as the law determines from time to time, and none other.' And again: 'It is not, then, a contract within the meaning of the clause of the Constitution which prohibits the impairing the obligation of contracts. It is, rather, a social relation, like that of parent and child, the obligations of which arise not from the consent of concurring minds, but are the creation of the law itself; a relation the most important, as affecting the happiness of individuals, the first step from barbarism to incipient civilization, the purest tie of social life and the true basis of human progress.' * * *

"And the Chief Justice cites in support of this view the case of Maguire v. Maguire, 7 Dana, 181, 183, and Ditson v. Ditson, 4 R. I. 87, 101. In the first of these the Supreme Court of Kentucky said that marriage was more than a contract; that it was the most elementary and useful of all the social relations, was regulated and controlled by the sovereign power of the state, and could not, like mere contracts, be dissolved by the mutual consent of the contracting parties, but might be abrogated by the sovereign will whenever the public good, or justice to both parties, or either of the parties, would thereby be subserved; that *being more than a contract, and depending especially upon the sovereign will, it was not embraced by the constitutional inhibition of legislative acts impairing the obligation of contracts.* [Italics ours.] In the second case the Supreme Court of Rhode Island said that 'Marriage, in the sense in which it is dealt with by a decree of divorce, is not a contract,

but one of the domestic relations. In strictness, though formed by contract, it signifies the relation of husband and wife, deriving both its rights and duties from a source higher than any contract of which the parties are capable, and as to these uncontrollable by any contract which they can make. When formed, this relation is no more a contract than "fatherhood" or "sonship" is a contract.'

"In Wade v. Kalbfleish, 58 N. Y. 282, 284, the question came before the Court of Appeals, of New York whether an action for breach of promise of marriage was an action upon a contract within the meaning of certain provisions of the Revised Statutes of that state, and in disposing of the question the court said: 'The general statute, "that marriage, so far as its validity in law is concerned, shall continue in this state a civil contract, to which the consent of parties, capable in law of contracting, shall be essential is not decisive of the question." 2 R. S. 138. This statute declares it a civil contract, as distinguished from a religious sacrament, and makes the element of consent necessary to its legal validity, but its nature, attributes, and distinguishing features it does not interfere with or attempt to define. It is declared a civil contract for certain purposes, but it is not thereby made synonymous with the word contract employed in the common law or statutes. In this state, and at common law it may be entered into by persons respectively of fourteen and twelve. It cannot be dissolved by the parties when consummated, nor released with or without consideration. The relation is always regulated by government. It is more than a contract. It requires certain acts of the parties to constitute marriage independent of and beyond the contract. It partakes more of the character of an institution regulated and controlled by public authority, upon principles of public policy, for the benefit of the community.'

"In Noel v. Ewing, 9 Ind. 37, the question was before the Supreme Court of Indiana as to the competency of the Legislature of the state to change the relative rights of husband and wife after marriage, which led to a consideration of the nature of marriage; and the court said: 'Some confusion has arisen from confounding the contract to marry with the marriage relation itself. And still more is engendered by regarding husband and wife as strictly parties to a subsisting contract. At common law, marriage as a status had few elements of contract about it. For instance, no other contract merged the legal existence of the parties into one. Other distinctive elements will readily suggest themselves, which rob it of most of its characteristics as a contract, and leave it simply as a status or institution. As such, it is not so much the result of private agreement, as of public ordination. In every enlightened government, it is pre-eminently the basis of civil institutions, and thus an object of the deepest public concern. In this light, marriage is more than a contract. It is not a mere matter of pecuniary consideration. It is a great public institution, giving character to our whole civil polity.' "

Similar announcements may be found in 1 Bishop on Marriage, Divorce, and Separation, §§ 24, 25, 30, 31. And in chapter 2 of the same work the author points out the difference between a contract to marry, and marriage itself, and to the confusion which may arise from many decisions in which marriage is termed a civil contract, rather than a status which results from the execution of the prior agreement to marry, and which prior agreement is submerged in the status. Section 16 reads, in part, as follows:

"No suit at law or in equity, sounding in contract, and going to the marital relation itself, can be maintained between husband and wife during their lifetime; and, after the death of one of them, an action of this nature will not lie against the representatives of the deceased. And where there is no remedy, not merely where the remedy is suspended for the want of a tribunal to administer it, there is no right. The suit for divorce, we shall hereafter see, is not an action upon contract, but a proceeding sui generis, founded on the violation of duties enjoined by law, and resembling more an action of tort than of contract."

And in section 32 the following is quoted from a Delaware case:

"The marriage contract is one of a peculiar character, and subject to peculiar principles. It may be entered into by persons who are not capable of forming any other lawful contract; it can be violated and annulled by law, which no other contract can; it cannot be determined by the will of the parties, as any other contract may be; and its rights and obligations are derived rather from the law relating to it than from the contract itself."

And in section 37 the author says:

"In the following pages, words will be used according to the reformed definings. While the executed marriage will be treated as a status, the executory agreement to marry will be presented simply as an ordinary contract to do a thing; for such the law deems it. And the agreement of present marriage, which enters into the solemnization, will be contemplated simply as the threshold over which two single persons are passing into the marital status. For 'all the authorities concur in the conclusion that marriage has its origin and foundation in a purely civil contract.' "

In our decisions the marriage status is sometimes referred to as a partnership, which is inaccurate and calculated to mislead, since it is obviously different from a partnership in so many respects, one of which it cannot, like a partnership, be dissolved by mutual consent. And since it is an institution, or status, it is also inaccurate, and calculated to mislead, to term it simply a "civil contract" governed by the laws of an ordinary contract, which likewise may be abrogated or modified by a subsequent agreement between the parties.

We have no statute in this state giving a wife a right of action against her husband such as is asserted by appellee in this case, and we have been cited to no decision and have found none in which such right is rec-

ognized. Indeed, in appellee's brief, the following is said in final argument:

"This cause is one of first impression and is unique in the jurisprudence of this country, and probably in the jurisprudence of the world."

If marriage is a legal status in which the prior agreement to marry is submerged, and after the consummation of which such prior agreement is of no further legal effect, then the right of action here asserted, necessarily, must arise from the common law pertaining to the marriage status.

By the consummation of the marriage relation, the parties thereto become entitled to all the benefits and assume all the obligations and burdens, and no more, which the law, either statutory or common, attaches to that relation or status, whether they intend or understand that such will be the consequences or not.

"Though marriage itself contains the elements of a contract, the rights and remedies of a married couple are governed by laws based on public policy irrespective of the intent of the parties or of the general rules of contracts." 2 Williston on Contracts, § 1031.

Trevino v. Trevino, 63 Tex. 650, was a suit by a wife who alleged that she was in feeble health, unable to maintain herself, and without means of support; that her husband had abandoned her and married another woman, and had otherwise treated her cruelly; also that he had dissipated her own separate property. In her petition she alleged that she did not desire a divorce, but prayed for an order requiring her husband to support her, in connection with the further allegation of facts showing that he was amply able to render such support. The following is the full text of the opinion of the Supreme Court in disposing of that case:

"The real object of this suit is to compel a husband to support a wife whom he has abandoned, and who is not seeking a divorce. If the plaintiff were suing for divorce her remedy would be complete. R. S. arts. 2860–2870. Or if she owned real estate, and her husband was improperly appropriating the revenues, she would have a somewhat restricted remedy; but not in the district court. R. S. art. 2856. But in the present case the wife appears to have no remedy—at least in this form of action."

In Nickerson v. Nickerson, supra, it was held that the wife, Amanda Nickerson, could not recover damages from her husband, Abram Nickerson, for a tort committed by him jointly with one Matson. In that opinion the court said:

"The rule at common law, that no action can be maintained by a wife for a tort committed upon her person by her husband, has been often said to rest upon their entire unity; but it would seem to us to rest rather upon grounds of public policy."

And Justice Stayton, in that opinion, further said:

"That the rules of the common law in relation to husband and wife have not been adopted in their entirety, is manifested by many statutes and decisions in this state."

The following is quoted from 13 R. C. L. p. 1394:

"At common law no cause of action arose in favor of either husband or wife by reason of any injury to the person or character of one committed by the other, for instance, libel or slander. This doctrine of nonliability is founded not on the inability of the one spouse to sue the other, but on the principle that husband and wife are one person in law, and it is well exemplified in the cases which hold that a wife after an absolute divorce from her husband, though she is then fully capable of suing him, still can maintain no action against him for a tort or wrong committed by him during the marriage relation against her person or character. So it is generally recognized that the Married Women's Property Acts, which enlarge the rights of married women even to such an extent as to permit a wife to sue her husband, do not entitle her to sue him for an injury to her person or character after their marriage, for the reason that whether a husband is liable to his wife therefor is not a mere question of procedure, but of substantial right. And this is held true under a statute authorizing the wife to bring and maintain an action in her own name for any injury to her person or character, the same as if she were sole; such a statute merely changes the procedure but gives no new right, and applies only to such causes of actions as could be maintained by the husband and wife as coplaintiffs before the statute took effect."

In Dority v. Dority, 96 Tex. 215, 71 S. W. 953, 60 L. R. A. 941, in an opinion by Justice Wiliams, reference was made to the case of Trevino v. Trevino, 63 Tex. 650; holding that a wife cannot maintain an action against her husband to require him to support her; and the decision in Nickerson v. Nickerson, 65 Tex. 281, in which it was held that the wife cannot sue her husband for a tort committed by him on her person. After reference to those decisions, the Supreme Court said that they were based upon the proposition that the wife had no cause of action of the character asserted.

The fact that the wrong committed by a husband constitutes a tort does not make it any the less a breach of the legal obligation assumed by him when he entered into the marriage relation to accord to her different treatment. Indeed, it would be difficult to imagine a more flagrant violation of his marital obligation and duty than to wrongfully have her arrested and imprisoned in the county jail, as was done in the Nickerson Case. And, if a wife is entitled to recover against her husband damages for breach of his marital obligation to her, clearly that right would not be lost if such breach is so outrageous

as to constitute a tort. And the cause of action asserted in the Trevino Case was based solely on a breach of a marital obligation and not on a tort. Shirley v. W. & T. Ry. Co., 78 Tex. 131, 10 S. W. 543; 38 Cyc. 430; Ann. Cas. 1913D, note p. 228.

In Montgomery v. Montgomery, 142 Mo. App. 481, 127 S. W. 118, the wife was allowed a recovery against her husband on a contract in writing to pay her $500, conditioned that he would not maltreat or abuse her in any manner, if she would marry the defendant; the contract being entered into prior to marriage and the obligation executed in order to induce the plaintiff to marry. It was held that the contract did not conflict with good morals or contravene any public policy, and that it was supported by a valid consideration.

In the case of Hite v. Hite, 136 Ky. 529, 124 S. W. 815, the wife was allowed to recover on the husband's written obligation to pay her $100 per month for her sole and separate use, if she would return to and live with him as his wife, after the wife had left him on account of his outrageously cruel treatment of her. The facts showed that the wife had been forced to separate from him on account of his cruelty, and that she was unwilling to risk his repeated assurances of better treatment until he entered into the written contract to pay her the money indicated above. The court held that the contract was supported by a valid consideration and it was not against public policy, since it was in aid of the marital relation and did not tend to destroy it.

In both of these cases the contracts sued on were obligations to pay money and were not obligations merely incident to and growing out of the marriage relation. Since they were supported by a valuable consideration, they were enforceable by the wife to the same extent as if they had been executed for property or money transferred to the husband. And in each case the statutes permitted the wife to institute such a suit against the husband.

Our statutes, permitting antenuptial marriage settlements of property in consideration of an agreement to marry, are based upon the same theory that the agreement is a valuable consideration which is not against public policy; and the same may be said of a suit for breach of a contract to marry. And a recovery against a third person for wrongfully interfering with and destroying the marriage relation is clearly distinguishable from the case at bar, since the defendant in such a suit is not a party to the marriage relation, and since his wrongful interference with it is contrary to public policy, which is interested in preserving, rather than destroying, that relation.

In Hedtke v. Hedtke, 112 Tex. 404, 248 S. W. 21, the Supreme Court of this state affirmed an award to the wife, when a divorce was granted, of a life estate in 100 acres of land which was the separate property of the husband, and in the opinion the following was said:

"While the court, in ordering the divorce, should not be unmindful of the benefits which the spouse not at fault would have derived from a continuance of the marriage, through the estate of the other spouse, its power is not limited to providing compensation for such benefits. Instead the court is to do complete equity as between the husband and wife and the children, having due regard to all obligations of the spouses and to the probable future necessities of all concerned. For the purpose of doing equity, the court may award all the personal property to either spouse, and may subject the income, rents, or revenues of all real estate, belonging to either or both of the spouses, to the support of either or both of them, or to the education and support of the children."

But that decision was by virtue of the provisions of article 4634, Rev. Statutes, which reads as follows:

"The court pronouncing a decree of divorce from the bonds of matrimony shall also decree and order a division of the estate of the parties in such a way as to the court shall seem just and right, having due regard to the rights of each party and their children, if any; provided, however, that nothing herein contained shall be construed to compel either party to divest himself or herself of the title to real estate."

In other words, the court held that, under the broad powers given by that statute to adjust the equities between the parties, such a disposition as indicated in the quotation above is permissible. But the rights so accorded the wife in that case, and what was there said, were based upon that statute, which has no application to the present suit.

It seems to us that to hold that a cause of action, such as here asserted, can be maintained in the courts of the country, would endanger the institution of marriage, and would therefore be against public policy. It is reasonably supposable that, if the rule were otherwise, then actions and cross-actions would constantly be instituted by and between spouses, and that the irritation from such controversies, involving criminations and recriminations, would strongly tend to separations and divorces, which probably would not otherwise occur, and would thereby tend to impair the institution of marriage, which is the chief support of the social edifice the world over, and without which the structure would fall. It is a matter of common knowledge that a suit even between two associates in any commercial business almost invariably leads to a dissolution of the business relation. And the fact that under the doctrine announced in Nickerson v. Nickerson, supra, the recovery in such a case would be the separate property of the one to whom it is awarded, since the guilty party

could not profit by his or her own wrong, would furnish an added incentive to sue for such damages in a suit like the present suit, and also to sue for a divorce and recover such damages in that suit and on the same grounds for which a divorce is sought.

It should be remembered, further, that if the wife can maintain such a suit, then, tested by the law governing civil contracts, the husband can likewise maintain a suit of the same character against the wife.

The doctrine of the common law that, in the interest of society, neither spouse can maintain against the other a suit of the character of the one now under consideration, is founded upon the experience and wisdom of centuries, and, in the absence of statutes to the contrary, we must be governed thereby. The "excelsior cry for a better system," in order to keep step with the new conditions and spirit of a more progressive age, must be made to the Legislature, rather than to the courts, whose only province is to enforce the law as they find it.

Although it may happen that, in individual instances, to give a right of action such as is here asserted would operate as a restraining influence upon a recalcitrant husband or wife "upon mischief bent," and cause him or her to accord to the other the treatment to which she or he is entitled, but which not otherwise be accorded, yet it is an elementary principle that every citizen must surrender some primary rights for the good of society, even the supreme sacrifice of life itself, in times of war.

Since the cause of action asserted in this suit is not given by the statutes of this state, nor by the common law, we conclude that the judgment rendered in favor of the appellee must be reversed and judgment must be here rendered that she take nothing by her suit; and it is so ordered.

CONNER, C. J. (dissenting). Coke, one of our oldest and greatest law writers, said that "reason is the life of the law," and I have been unable to either approve the reasons given for denying the wife the right to sue her husband or to find any sufficient reason why she may not do so when necessary for her protection. In entering upon a discussion, it is well to remember that the question is of very great importance to every woman who is, or may become, a wife or mother—a highly cherished portion of our people. It may further be well to call attention to the fact that the finding of the jury in this case, that the husband was guilty of insupportable outrages and cruelties in violation of his marital obligation, is not questioned, and that the rule, as applied by the majority, admits of no exception. In other words, the rule, as announced, is not based on the amount or extent of the husband's cruelty, but applies to every class of outrage or degree of cruelty, including maim-

ing, blinding, or otherwise injuring the wife for life. I wish to premise one other thought, and that is that in view of the importance and far-reaching effect of the determination, and of the present condition of our laws and people, I have felt free to express my views, notwithstanding the fact that no case such as this has been found. The courts will poorly perform their functions if they deny a patient hearing and a fearless determination of any demand for relief on the ground that the demand is out of the ordinary, and that no court before has entertained a like plea. To deny relief on such grounds is to deny all change or progress in our laws.

Our Constitution, art. 1, § 19, declares that:

"No citizen of this state shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

Section 13 of the same article provides, among other things, that:

"All courts shall be open; and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."

In a very early case (Morton v. Gordon, Dallam, Dig. 396) our Supreme Court, in construing a constitutional provision, gave (quoting from the headnotes) the following rules of construction:

"It is a rule of constitutional construction, that where the grant of power inures solely to the benefit of the grantor (the people), it is to receive a benign and liberal construction.

"Another rule of constitutional construction is, that where the power granted is in general terms, it is to be construed as coextensive with the terms, unless some clear restriction upon it be deducible from the context.

"It is sufficient, however, if. the restriction arise by necessary implication. But it is not sufficient to show that there was, or might have been, a sound or probable motive to restrict it. A restriction founded upon conjecture is wholly inadmissible."

In 6 R. C. L. p. 285, § 272, under the head of "Access to Courts," it is said:

"Among the privileges and immunities of citizenship are included the right of access to court for the purpose of bringing and maintaining actions; and this includes the right to employ the usual remedies for the enforcement of personal rights in actions of every kind—a right which cannot be abrogated or even suspended. It has been said that the right to sue a defendant in the courts is one of the highest and most essential privileges of citizenship."

In 12 C. J. p. 1287, § 1100, it is said:

"Among the most highly prized and hardly won of the rights conferred by Magna Charta were those guaranteed by the brief but expressive clause: 'We will sell to no man, we will

not deny to any man, either justice or right.' In a large number of state Constitutions provisions of like import have been inserted to the effect that the courts shall be open to every person; that each individual shall have a prompt and certain remedy by due course of law for injuries which he may receive in his person, property or reputation; that he shall obtain such remedy freely without being obliged to purchase it; and that justice shall be administered impartially and without prejudice."

The same author again says in section 1101 that:

"The guarantee as to open courts opens to every subject equal access to courts established by the state."

In U. S. v. New Orleans (C. C.) 17 Fed. 490, the court in construing a provision similar to that in section 13, art. 1, of our Constitution, quoted above, had this to say:

"I understand this provision to be applicable to the redress for all wrongs done to person or property, and to that extent to give to the redress for wrongs a coequal if not paramount security to that guarantee for the enforcement of contracts. I understand this provision to ordain, in behalf of those who, like the relator, are seeking reparation for injury done to themselves or their estate, not only that the courts shall be always open, not only that the courts shall have jurisdiction, not only that the suitors shall have a speedy and just trial, not only that there shall be awarded due process but in addition to all there is solemnly ordained and guaranteed a remedy entirely adequate."

In Byers v. Company, 84 Ohio St. 408, 95 N. E. 920, 38 L. R. A. (N. S.) 913, the Supreme Court of Ohio, quoting from a Michigan case, says:

"It is not competent for the Legislature to give one class of citizens legal exemption for wrongs not granted to others; and it is not competent to authorize any person, natural or artificial, to do wrong to others without answering fully for the wrong."

In section 430 of Speer's Marital Rights, one of our own law writers of acknowledged standing and ability has said:

"The law recognizes the wife's right to sue and her liability to be sued. The writer does not like the expression found in some of the cases that the 'law confers' upon the wife the power to litigate. He prefers to think the courts of the country are at all times open to every citizen and that this right to have one's grievance thus determined should not be denied to the humblest, whether that person be male or female, married or unmarried, and that this right exists in all instances, where there is a wrong to be redressed. It is not the business of statutes to 'confer' the right on any one, but only to regulate it. He prefers to believe that the section of the Bill of Rights (Const. art. 1, § 13), which declares that 'all courts shall be open; and every person for an injury done him, in his lands, goods, person or reputation shall have remedy by due course of law,' includes women, notwithstanding they may be married. The law no more 'confers' upon a married woman the right to appear in court than it confers upon a married man the right."

Upon what sustainable ground, then, must it be said that the appellee in this case shall be denied relief, and the verdict and judgment of the trial court in her favor be reversed?

As against all persons, except the husband, the majority concedes that the damages awarded to appellee constitutes her separate property, and it was expressly so decided by our Supreme Court in the case of Nickerson v. Nickerson, 60 Tex. 281. In that case Mrs. Nickerson sued her husband and one Matson for damages for a tort committed by Matson and plaintiff's husband jointly. It was held that the damages awarded to the wife in the action was not only property, but the separate property of the wife and recoverable against Matson. Of such, by our present statutes (Rev. Statutes, art. 4621), the wife, during marriage, has been given "the sole management, control and disposition." The case of Nickerson v. Nickerson, in argument before us, seemed to be the main reliance of appellant in opposition to the judgment, but it will be seen by a consideration of the opinion that that case, even if sustainable in reason, is distinguishable from the one before us, in that there the action was grounded solely upon a tort, whereas here the action, under the allegations of the plaintiff's petition, is for a breach of the marriage contract accompanied with circumstances of aggravation. Indeed, the damages awarded by the judgment below were not given as compensation for mental pain or bodily injuries, but, on the contrary, because of an absolute repudiation and breach of marital obligations resulting in the utter loss of the principal benefits of a normal married life. The issue of a breach of contract could not have been involved in the case of Nickerson v. Nickerson, for Matson, against whom the judgment was affirmed, was not a party to the marriage contract between Mrs. Nickerson and her husband. But it is argued, elaborately and with much force, that marriage is a "status" and not a contract, and in support of this contention the cases of Grigsby v. Reib, 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011, and Maynard v. Hill, 125 U. S. 211, 8 Sup. Ct. 723, 31 L. Ed. 654, and other authorities containing similar expressions on the subject, are cited.

It is, of course, not easy to reconcile everything said in the cases. To properly understand a decision, we must interpret what is said in the light of the particular circumstances of that case. The utterances of a court, in order to be binding and authoritative, must be asserted in the determination of some question necessarily involved in the case. Where, in the decision of the cause, an opinion is expressed which is not neces-

sary to the decision of the cause, it is obiter dicta. See Ballard v. Carmichael, 83 Tex. 355, 18 S. W. 734; American Surety Co. v. San Antonio Loan & Trust Co. (Tex. Civ. App.) 98 S. W. 387; Johnson v. Harrison, 48 Tex. 257; Creamer v. State, 34 Tex. 173; Field v. State, 34 Tex. 39; Edwards· v. Brown, 68 Tex. 329, 4 S. W. 380, 5 S. W. 87.

In 18 R. C. L. p. 383, the following is said:

"Marriage, in its origin, is a contract of natural law, though in most countries acting under a sense of the force of sacred obligations, it has had the sanction of religion superadded. In all civilized communities it is in its creation contractual, in that it requires capacity and consent on the part of those who enter into the relation, and, so far as its validity in law is concerned, it is universally treated as a civil contract.

"Marriage is something more than an ordinary civil contract, for it creates a social status or relation between the contracting parties, in which not only they but the state as well is interested, and involves a personal union of those participating in it of a character unknown to any other human relation, and having more to do with the morals and civilization of a people than any other institution. Some courts have gone to the extent of holding that marriage is not a contract but a status created by mutual consent of one man and one woman and that the rights and obligations of the parties are not contractual, but are fixed, changed or dissolved by law. According to some of these decisions the main purpose of calling marriage a civil contract is to negative the idea that it is an ecclesiastical sacrament, or that in the eye of the law it is controlled by the mandates or dogmas, or subject to the observance of the rituals or regulations, of any particular churches or sects. The theory that marriage is a civil status has, however, been seriously questioned in some jurisdictions. But this question is merely academic. The courts may define and characterize the relation as best suits their fancy, but its validity and effect are tested by the same general principles regardless of the nomenclature that may be adopted."

Numerous authorities are cited by the author in support of the text quoted, and other authorities might also be cited to the effect that marriage is constituted by a civil contract between a man and woman of marriageable age and competency. The obligations of one to the other are within the common knowledge of us all. In our civil ceremony, the promises are mutual, including promises on the part of the husband to love, cherish, and support his wife. That the mutual promises or contract of marriage between a man and woman, when viewed in their individual relations and apart from the interest of the state therein, contain every element of an enforceable agreement, cannot be denied, and the fact that the state in its own interests superimposes a relation to the public that has been termed a status, imposing duties and obligations to the state, does not render the agreement of the individuals less a con-

tract as between themselves, and this distinction, as it seems to me, is to be observed in considering the cases of Grigsby v. Reib and Maynard y. Hill, supra.

In the Grigsby Case, the woman was claiming property which she could only recover as a married woman, under our statutes of descent and distribution, and the court was discussing and opposing that line of authorities which held that marriage could be constituted by a mere agreement without living and cohabiting together, and it was in this connection that Judge Brown said that marriage was a status and could not be created by agreement.

In the case of Maynard v. Hill, a divorced wife was seeking to recover an interest in certain lands acquired by the husband after the divorce, and it was contended in behalf of the wife that the divorce· was invalid for the reason that no cause therefor existed, and that it was obtained without the knowledge of the wife. The lands in controversy and the suit was in Washington territory, while the decree of divorce had been procured in the territory of Oregon, and the subject discussed and determined was the validity of the legislative act of Oregon authorizing the decree. The court, in discussing the question, among other things, said, however, that:

"If the act declaring the divorce should attempt to interfere with rights· of property vested in either party, a different question would be presented."

In both of those cases the rights asserted and denied · were not based upon alleged breaches of a marriage contract, but, on the contrary, on allegations of such a contract fully executed, and for rights wholly dependent on statutes alone applicable to married persons.

In this connection, I think it is to be further observed that the marriage contract and the marriage status is to be separated and distinguished in that the contract or agreement alone will not constitute the status. This is demonstrable by the decision in the case of Grigsby v. Reib. It was there held that a mere agreement to marry without cohabiting and living together as man and wife did not constitute the status of marriage, and it is common knowledge that the mutual agreement and promises of the parties in a marriage ceremony precedes the birth, so to speak, of the status. It takes the final pronouncement of the officiating authority or a living and cohabiting together to constitute the unified relation and obligation of the parties to the state. We have numerous cases upholding suits for damages because of a breach of the promise of marriage, and it does not seem easy to assign any very satisfactory reason why the principles adopted in those cases should not apply in this case. It is insisted, however, that the present suit is prohibited by the

common law and article 5492, Rev. Statutes, is invoked in support of the proposition. This statute reads:

"The common law of England, so far as it is not inconsistent with the Constitution and laws of this state, shall, together with such Constitution and laws, be the rule of decision, and shall continue in force until altered or repealed by the Legislature."

The origin of this statute seems to have been a provision of the Constitution of the republic of Texas, adopted in 1836, and an act of Congress of the republic, passed January 20, 1840. Article 5492 is substantially the same as the act of Congress, except that it was the act of the state instead of the Congress. The constitutional provision of the republic, by virtue of which the act of January 20, 1840, was passed, reads as follows:

"The Congress shall, as early as practicable, introduce by statute the common law of England, with such modifications as our circumstances, in their judgment, may require; and in all criminal cases the common law shall be the rule of decision." Const. art. 4, § 13.

It will be observed that the command of the Constitution of the republic that the common law should be the rule of decision is limited to criminal cases, thus inferentially denying to the Congress the power to make it the rule of decision in other cases. So that, if we give to article 5492 the legal effect of the act of 1840, it is properly to be limited to criminal cases and as having no application to civil suits such as the one before us. Moreover, I fail to find in the Constitution of 1876, which constitutes the present reliance of our people any express declaration or provision to the effect that the common law of England shall be adopted or constitute the rule of decision. This possibly is significant, in view of the general expressions in section 48, art. 16, of the Constitution, that "all laws and parts of laws now in force in the state of Texas, which are not repugnant to the Constitution of the United States or to this Constitution, shall continue and remain in force as the laws of this state, until they expire by their own limitation or shall be amended or repealed by the Legislature," thus affording a presumption that in adopting article 5452 it was intended that it should be given its proper construction under the Constitution of the republic. But, however this may be, and regardless of this suggestion, it is clear, under the terms of article 5492, that the common law of England is not the "rule of decision" when inconsistent with the Constitution and laws of this state. In 13 R. C. L. p. 1394, § 443, it is said:

"At common law no cause of action arose in favor of either husband or wife by reason of any injury to the person or character of one committed by the other, for instance, libel or slander. This doctrine of nonliability is founded not on the inability of the one spouse to sue the other, but on the principle that husband and wife are one person in law."

Chief Justice Hemphill in Black v. Bryan, 18 Tex. 461, said:

"At common law the personal existence of a married woman is merged, for the most part, in that of her husband. Her disability is almost complete. Her personal property, by marriage, vests in the husband; and the right of disposition of her real property, and even taking its fruits, is taken away from her."

The increase in knowledge and the spread of individual freedom has in a large measure stricken from woman fetters forged during the earlier years of our civilization and the fiction of unity in law of the husband and wife has long since been abrogated, and it is a canon of construction that, when the reason for a rule fails, the rule itself must fail. It is historically true that prior to the independence of Texas she was a province of Mexico, governed by the civil laws of Spain, and the rights of the wife were not restricted, as in the common law; on the contrary, by the acts of the republic and by numerous provisions of the Constitution and legislative acts after the formation of Texas into a state, a wife's rights were greatly enlarged. In George v. Stevens, 31 Tex. 670, our Supreme Court said:

"When the Congress of the Republic of Texas, through the influence of a disciple of Coke, passed an act introducing the common law of England to be the rule of decision of the republic, it was fortunate for the female branch of the human family that there were in that legislative assembly those who were unwilling that wives should occupy the station assigned them by the common law of England. So discordant is the common law of England with the statutes declaring marital rights—so utterly inconsistent is that law, which merges the political and judicial existence of a woman in her husband on marriage, with the laws that concede to a wife her separate rights of property and person, and a standing in the judicial tribunals to sue for and defend them—that a system of jurisprudence based upon a mixture of these incongruities cannot be otherwise than discrepant and incongruous."

In Barkley v. Dumke, 99 Tex. 150, 87 S. W. 1147, our Supreme Court, in an opinion by Chief Justice Gaines, discussing the applicability of the common law to marital rights, said:

"Perhaps, under the strict rules of common law, we should be constrained to rule that the marriage of defendant in error with Wood was absolutely void to all intents and purposes, and therefore to hold the conveyance from Wood and the putative wife also void. But we are of the opinion that the common-law rule does not apply to this case. The title of the act of January 20, 1840, entitled 'An act to adopt the common law of England, to repeal certain Mexican laws, and to regulate the mar-

ital rights of parties,' indicates that the rights of married persons were to be defined by statute, and not to be governed by the rules of the common law. The provisions of the act with reference to married persons are so inconsistent with the rules of the common law as to show an intention to maintain in reference to marital rights a radically different system. The fact that these provisions were incorporated in the act which adopted the common law is of itself significant of the purpose of the Legislature not to apply the rules of the common law as to the property rights of husband and wife. In this connection it is notable also that the statutory rules which were adopted are taken in the main from the Spanish law, which then prevailed in the republic. So striking is this fact as to justify Chief Justice Hemphill in saying, in Purr v. Wilson, 18 Tex. 370: 'Our laws on marital rights are in substance but a continuation of the rules of Spanish jurisprudence on the same subject-matter;' and again, in Bradshaw v. Mayfield, 18 Tex. 29: 'But the common law is not, and never has been, of force in this state on the subject of marital rights.' "

Even in the absence of statutory regulations to the contrary, it has been held, notwithstanding the statute under consideration that the common law has been adopted only in so far as it is adapted to our changed conditions and circumstances. See Clarendon Land, etc., Co. v. McClelland, 86 Tex. 179, 185, 23 S. W. 576, 1100, 22 L. R. A. 105; Davis v. Davis, 70 Tex. 123, 7 S. W. 826; Connor v. Mackey, 20 Tex. 748; Winn v. Ft. W. & R. G. Ry. Co., 12 Tex. Civ. App. 198, 33 S. W. 593; Cargill v. Kountze, 86 Tex. 386, 22 S. W. 1015, 25 S. W. 13, 24 L. R. A. 183, 40 Am. St. Rep. 853.

No one can doubt that great changes have been made generally in the condition and legal status of woman from that existing in the days of the common law. But particularly, by express statutory enactment beginning at an early day, has there been a change in a wife's legal right to own property and have an entity independent from that of her husband, so much so as to impel our Supreme Court, in Barkley v. Dumke and other cases cited above, to declare that as to marital rights the common law is not and never has been of force in this state. The conclusions so stated are emphasized by numerous liberalizing legislative enactments regulating marital rights, both before and after the discussion in Black v. Bryan, George v. Stevens, Nickerson v. Nickerson, and Barkley v. Dumke, hereinbefore cited. For legislative acts so showing, see Rev. Statutes, arts. 4621, 4621a, 4622, 4624, and numerous other articles, such as article 1839, providing when the wife may sue for the recovery of her separate property; article 1840, directing how she shall be sued upon contracts by her for necessaries and for expenses incurred by her for the benefit of her separate property; article 4625, directing the execution of judgments against the spouses; article 4626, providing a summary method to compel the husband to support the wife from the proceeds of lands she may have; article 4627, declaring the liability of the community property; article 4628, declaring females under 21 years of age to be emancipated by marriage; article 4629, defining the rights of persons married elsewhere; articles 4629a to 4629d, providing for the removal of the disabilities of coverture from married women for mercantile and trading purposes. So that it is thus seen that our Legislature has entered and occupied the entire field of marital regulations from which it must be implied that it was and is the legislative intent to provide for all needful regulations to the exclusion of all laws and rules of an extraterritorial or foreign power.

In concluding this branch of the subject it seems to me that the separate rights of property, both real and personal, given to the wife by article 4621, Rev. Statutes, together with absolute control thereof, independent of her husband, is inconsistent with the contention that by virtue of article 5492 she must be denied the right asserted in this case. As said by Chief Justice Phillips in Spann v. City, 111 Tex. 350, 235 S. W. 513, 19 A. L. R. 1387:

"Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment and disposal. Anything which destroys any of these elements of property, to that extent destroys the property itself. The substantial value of property lies in its use. If the right of use be denied, the value of the property is annihilated and ownership is rendered a barren right. Therefore the law which forbids the use of a certain kind of property, strips it of an essential attribute and in actual result proscribes its ownership. * * *

"To secure their property was one of the great ends for which men entered into society. The right to acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody is a natural right. It does not owe its origin to Constitutions. It existed before them. It is a part of the citizen's natural liberty—an expression of his freedom, guaranteed as inviolate by every American bill of rights. It is not a right, therefore, over which the police power is paramount. Like every other fundamental liberty, it is a right to which the police power is subordinate.

"It is a right which takes into account the equal rights of others, for it is qualified by the obligation that the use of the property shall not be to the prejudice of others. But if subject alone to that qualification the citizen is not free to use his lands and his goods as he chooses, it is difficult to perceive wherein his right of property has any existence.

"The ancient and established maxims of Anglo-Saxon law, which protect these fundamental rights in the use, enjoyment and disposal of private property, are but the outgrowth of the long and arduous experience of mankind. They embody a painful, tragic his-

tory—the record of the struggle against tyranny, the overseership of prefects and the overlordship of kings and nobles, when nothing so well bespoke the serfdom of the ' subject as his incapability to own property. They proclaim the freedom of men from those odious despotisms, their liberty to earn and possess their own, to deal with it, to use it and dispose of it, not at the behest of a master, but in the manner that befits free men.

"Laws are seldom wiser than the experience of mankind. These great maxims, which are but the reflection of that experience, may be better trusted to safeguard the interests of mankind than experimental doctrines whose inevitable end will be the subversion of all private right."

Mr. Justice Greenwood, in Whitney Hardware Co. v. McMahan, 111 Tex. 242, 231 S. W.· 694, had this to say:

"As incidents to the wife's power of exclusive management and control of her separate property and of the specified portions of the community, she became vested with all such contractual power relative to same, as is requisite to make her power effectual. * * *"

Again it is insisted that suits by the wife against the husband are against public policy and hence to be denied. As will be seen by the definitions of the term as given in Words and Phrases, vol. 6, p.· 5813, "Public policy" is defined as a "variable quality"—a term of vague and uncertain meaning. Mr. Williston in his work on contracts (volume 3, § 1629) cites an English case in which it is said that "the question of public policy may well give rise to a difference of judicial opinion." Public policy, it was said by Burroughs, J., in Richardson v. Mellish, "is a very unruly horse, and when you once get astride it, you never know where it will carry you." In the preceding sections it is said:

"If there is one thing more than any other which public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that contracts, when entered into freely and voluntarily, shall be held good and shall be enforced by courts of justice."

Certainly then a case, not expressly forbidden by law, ought to very clearly be against public morals or the public good before relief otherwise recoverable should be denied.

· Numerous cases may be found where suits by the wife against the husband, and the husband against the wife, have been entertained by the courts. For instance, the case of Newman v. Newman, by the Court of Civil Appeals of the First Judicial District, 86 S. W. 635, was one in which Geo. W. Newman, the husband, brought suit against Sarah Jane Newman to procure the cancellation of two deeds, by their terms conveying certain lands to her in her separate right. In disposing of the case, among other things, the court said:

"It seems now to be well settled in this state that a husband may maintain a suit against his wife to settle property rights," citing McCartney v. McCartney, 93 Tex. 359, 55 S. W. 310.

The latter case is one by our Supreme Court in which the husband sued his wife, who was a lunatic confined in an asylum, to cancel a certain deed conveying to her certain lands on the ground that the deed had never been delivered by him and was never intended to· take effect, etc. The case was entertained and disposed of without any intimation that it was not cognizable by the court because of the fact that the parties were husband and wife and undivorced. The case of Martin Brown Co. v. Perrill, 77 Tex. 199, 13 S. W. 975, was one in which Maggie Perrill, the wife, sued her undivorced husband and P. F. Fox, partners doing business under the firm name of "Perrill & Fox," to recover the amount due upon a promissory note executed by them to W. M. Perrill as her trustee. She also caused a writ of attachment to issue and to be levied upon a stock of goods belonging to the defendants. This suit also was entertained and disposed of by our Supreme Court, upholding the right of the wife to sue her husband.

In Heintz v. Heintz, by the Dallas Court of Civil Appeals, 56 Tex. Civ. App. 403,· 120 S. W. 941, the wife sued her husband for divorce and custody of their minor child and to have a resulting trust adjudged in her favor in land held by him, paid for out of her separate funds, and for judgment for moneys belonging to her separate estate alleged to have been wrongfully converted by him. It appeared that at the time of the trial the parties lived in the same house, occupying separate rooms and that neither contributed to the other's welfare and 'that the separation between the parties was permanent. The court in disposing of the case held, in effect, that, independent of the wife's suit for divorce and custody of the child, she could sue her husband to recover moneys belonging to her separate estate, wrongfully conveyed by her husband and also to have a resulting trust declared in her favor in land held by him in his own name, but paid for, in whole or in part, out of the wife's separate funds.

In Shaw v. Shaw, by the Galveston Court of Civil Appeals, 50 Tex. Civ. App. 363, 111 S. W. 223, Mary G. Shaw sued her husband, B. W. Shaw, to recover property and to enjoin and restrain him from disposing of the same or converting the proceeds thereof to his own use. This suit also was entertained and disposed of without reference to the marital relation of the parties.

In Dority v. Dority, 96 Tex. 215; 71 S. W. 950, 60 L.·R. A. 941, our Supreme Court sustained the right of a wife to sue her husband in protection of her separate property and awarded an injunction against him to pre-

vent his interfering therewith. In disposing of the case the court, among other things, said:

"The question whether or not, at the suit of a married woman other than for divorce, a court may restrain a husband from exercising over his wife's separate property the control expressly given to him by statute during marriage, is one of grave importance and of considerable difficulty. At common law a wife could not sue her husband. As a result of our statutes recognizing the separate existence of married women and conferring upon them capacity to own property, it is settled, in this state, that causes of action in their favor, incidental to their ownership, may arise and be asserted in the courts against their husbands."

In the case of Ryan v. Ryan, 61 Tex. 473, it appears that Josephine Ryan sued her husband, A. P. Ryan, living together as husband and wife, upon a debt of the husband created during the existence of the marriage relation and had an attachment levied on the community property of herself and her husband. The husband made no appearance, but certain creditors of his intervened, alleging that the plaintiff and defendant were husband and wife; that the debts of the interveners were community debts, and the property attached by the wife community property; and, hence, the plaintiff's levy of attachment should be subordinated to the attachment of the interveners. The trial court charged the jury:

"That plaintiff and A. P. Ryan, being husband and wife at the date the suit was brought, she could not by her attachment of community property acquire paramount rights over community creditors, and to find for interveners."

Judgment for the intervening creditors was accordingly entered. But on appeal our Supreme Court held that the trial court erred in giving the charge quoted, saying, among other things, that:

"Under the liberal provisions of our Constitution and laws for the protection and preservation of the separate property and rights of married women, we are of opinion that the wife can maintain, in her own name, her action in the case under consideration. We also believe that she would be entitled, in a proper case, to the benefit of writs of attachment, sequestration, injunction, or any like writ, to which any other creditor would be entitled, in order to protect and preserve his rights."

In Montgomery v. Montgomery, 142 Mo. App. 481, 127 S. W. 118, a suit by the wife against the husband on a contract binding him to treat her as a husband should treat his wife, it was held that the contract was not invalid and was enforceable and not contrary to public policy, quoting the following from the Supreme Court of Georgia:

"Judicial tribunals hold themselves bound to the observance of rules of extreme caution when invoked to declare a transaction void on grounds of public policy, and prejudice to the public interest must clearly appear before the court would be warranted in pronouncing a transaction void on this account. It is said that the power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."

The opinion in the case of Montgomery v. Montgomery also cites with approval the case of Woodruff v. Woodruff, 121 Ky. 784, 90 S. W. 266, 91 S. W. 265, where the wife had separated from her husband by reason of his mistreatment of her, and he, for the purpose of inducing her to return, agreed that if she would return, and should thereafter again be compelled to leave him by reason of mistreatment, she should receive $50 per month during the remainder of her natural life. The husband, having again mistreated her, she left him and brought suit upon the contract and it was upheld. In the course of the opinion, the court said:

"We can see no grounds upon which it can be maintained that a contract to do what the law would require done without a contract violates any public policy."

See, also, Hite v. Hite, 136 Ky. 529, 124 S. W. 815, where a similar contract was upheld by the same court, and the reasoning in the Woodruff Case approved.

The right of a wife to damages for injury to her person, such as was awarded to her in this case, is as clearly property belonging to her in her separate right as any other species of property, however acquired, and I can see no reason or policy for denying her the right to recover it in a suit against her husband on the ground of public policy that did not exist in the numerous cases above cited, wherein she has been accorded that right. It is said that suits such as this tend to arouse animosities and friction between the spouses and hence to destroy that degree of harmony and unity of purpose which it is to the interest of the state to guard and to foster; if so, the same must be said of that character of suits noted above. Suit by the wife to recover a piece of furniture, an article of clothing, or upon a promissory note belonging to her separate estate is as certainly productive of resentment on the part of the husband as a suit for the actual loss occasioned in this suit. There can be no consistency in holding one class of suits forbidden on the ground of public policy and the other not, and, when we consider the gentleness, devotion and fidelity generally possessed by the wife to her husband, home, and children, such disturbances on her part for mere gain will be, to say the least of it, very infrequent; while such a right accorded to her within the knowledge of the husband may operate even more strongly to restrain him

from outrages and cruelties inflicted upon his wife, such as may easily be imagined, and such as is of not infrequent occurrence.

The outrages and cruelties inflicted by the husband upon the wife in this case may not have been of the most aggravated character, but they were of such a character as to render their living together insupportable, and to thus breach the marriage contract. It was so found by the verdict of the jury, and the verdict was approved by the court; and on this appeal appellant has not questioned these findings, so that the principle involved is the same as would be involved in a case of a more aggravated nature, and it seems insupportable to me that a rule should be adopted which would leave a wife without an adequate remedy where she had been, by some outrageous or cruel act on the part of the husband, compelled to flee from him, disabled for life and thus forever deprived of the benefits to which she was entitled by virtue of her marriage contract. I do not think it is an answer to say that the statutes have provided the remedy of divorce and empowered the judge to make such disposition of the property of the parties as will be just, for it may be that no scriptural ground for a divorce exists, and the wife, believing in the announcement, "Let no man put asunder those whom God hath joined together," on conscientious grounds, or because of a tenet of church, feels compelled to not sue for a divorce. Or, again, it may be, as indicated in this case, that the property over which the court may have jurisdiction is altogether the separate real property of the husband, and while the court would have the power to make such disposition thereof as would be sufficient for the support of the wife, yet if the damage done her is her separate property, as expressly held in Nickerson v. Nickerson, supra, it would seem that in right she should be entitled to recover the entire damage in solido and be able to transmit it to her descendants or heirs, as in the case of any other property. Nor is it an answer to say that the husband may be punished criminally for acts of cruelty committed upon the wife, for the conviction of the husband affords the wife no compensation; it can only feed her emotional nature, such as pity or a feeling of revenge. It is suggested that the question of permitting the wife to sue the husband in cases such as this is one for the determination of the lawmaking power and not the courts. The answer is that in so far as legislative sanction is necessary it has already been given, as in other cases, by necessary implication from the enactments giving the wife the exclusive management and control of her separate property.

I am not unmindful of the force of the contrary views of the majority as presented in the able opinion of my esteemed associate, Mr. Justice DUNKLIN; nevertheless, with the vision in mind of the wives and mothers of men as I know them, I have resolved in their favor whatever of doubt there may be, and will conclude by saying that, aside from a deep-seated conservatism and very natural tendency of the American bred lawyer to adhere to old standards, I have been unable to find any logical reason for the conclusion that appellee's case is not within the broad general terms of our constitutional guaranties, or that, in such cases, relief, in this day of enlarged recognition of woman's marital rights, should be denied by mere inferences or the pronouncements of law-writers of a different age founded on dissimilar circumstances and different laws.